Your Honor, my name is Jason Owens, and I represent the appellants in this case asserting qualified immunity with respect to their response to a riot in the Faulkner County Jail in Conway, Arkansas. This appeal revolves around two claims that were affirmed and are set to proceed to jury trial against several officers of the Faulkner County Jail. Those claims would be claims of excessive force and failure to protect or intervene, and I'll speak to each of those individually. First with respect to the claim of excessive force, the appellees, the plaintiffs below, alleged that during this jail riot they were uninvolved in the riotous activities and instead went into their cell where they were coincidentally shut in. They say that, testify that they laid a blanket or a towel down in the, I think it's said both ways to my recall, in the threshold of the door and then another inmate slammed the door shut causing the towel or blanket to wedge in between the door, and that they were clearly innocent bystanders of this riot. Certainly there is a video of this incident as well as testimony by the officers about what occurred before. I would submit, and I think we have submitted in our briefs, that there is no dispute about what happened before the door to their pod or bedroom compartment opened. There's no dispute that these inmates had been engaging in separate riotous activities for several days. Well now, Counselor, if you look at the video, it looks like they're pretty peaceful all that period of time. It's pod B, right, where they are? Yes, Your Honor. I know one of them covers the face and one hides in the shower, but boy, they look pretty peaceful. Well, there's also water, standing water in the pod. They've overflowed the toilets and the cell and the showers. So they're standing in it? They're standing in it, trying to push it out the doors, down the hallway. They're not too aggressive on that, though. They're not too aggressive fighting the water, are they? No, I would agree with that. That's what the video seems to show. But once they get into the cell, I think it was pod A, for instance, they found that one of the metal shelving units had been dislodged from the cinder block wall. All that has to indicate to the officers that they were attempting to fashion weapons or some other defense. That's not B, though, Counselor. Pardon? Aren't all these plaintiffs from B, pod B? They are, but I think if the court will review, there's a video from an hour before this incident. These inmates are involved, and you do see the appellants try to say that these are only white inmates that are masked and involved. But I think my recall of the video is that you see, at least early on, some black inmates involved as well with masked faces. But at some point, they do retreat into this cell. They are barricaded in this cell, and they say they can't barricade because the door opens to the outside. But then, interestingly enough, one of them testified that he was able to pull the blanket or towel out from under the door before the officers came in. That's a virtual impossibility, if you really think about the physical reality of that, that it got slammed in the door, according to the plaintiffs, and yet he's able to pull it out while the officers are unable to open it from the outside. Of course, the officers testify they actually had to use a crowbar to get the door open. But they... Doesn't this case really come down to what happened when they came in or when they were getting ready to come in? Their testimony is, we were completely compliant. The officers say no. Fact question has to be taken in the light most favorable. If they weren't compliant, certainly you can use a level of force. If they weren't compliant, certainly you can use a level of force. If they were completely compliant, probably excessive force. And here's the problem I have. If the video was crystal clear, then we could rely on, I think it's the Scott case, and say, okay, fine, the video is crystal clear, and that establishes one way or the other what happened. But I looked at the video, and I couldn't tell what was happening in pod B. No, I would agree with that, and that is the crux of this case. The crux is, based on the undisputed facts from the video preceding entry into pod B, the undisputed facts of the officer's testimony preceding entry into pod B... Does any of that really matter? It might matter in terms of context. My question was, does any of that really matter? Because if they were riotous before, but completely compliant when the officers came in, I don't think you get to use a lot of force, do you? Well, I think it does, because it goes to the question of exactly how are these officers supposed to respond when entering a darkened cell, the lights were indisputably out, and had been broken in that cell, with multiple inmates in a small area, they've got to converge with sufficient numbers to ensure that they're not overwhelmed, all in a small space. Certainly, what they've encountered before, including the barricaded door, plays into the analysis of their state of mind and what level of force they can use. But if every one of them is laying on the floor, hands clasped behind their back, completely compliant, some on their knees... And I think the other point here is that the court, the district court kind of looked at this globally and said, well, here's what happened. The officers come in and this force happens, and denied qualified immunity to all the officers without getting down into the discrete questions of what force was used by what officer against what inmate. For instance, the inmates said that some of them were kicked by unidentified jailers. And the case law certainly stands for the proposition that where you can't identify your assailant, you can't pursue a 1983 claim for excessive force. Yeah, but generally we can identify them. Generally because of this video, we can identify who was kicking and who was shooting and all that, right? But not here, because it's less clear once they get into the pod exactly who's doing what and all you see are bats, basically, and some dark space. But when you look at the force that's even alleged in the testimony of the appellees, they start with, they stepped on us. Well, they're saying there were four, I think four, maybe five inmates laid out in an eight by eight space. If you rush four or five jailers into that space, it's just inevitable that someone's going to be stepped on. Not as a matter of force. The district court begins with a grenade. District court thinks that's the best plan. Well, and there's no case that has ever said that when you're entering a darkened pod with multiple inmates that's been barricaded, and you've got to rush in instantaneously with several jailers, that you can't throw some device in there to disorient them. If they're lying on the floor, some of them on their knees, you still do that? It's dark. They can't tell that. There's no evidence in the record that they can tell. I don't know. If you look at that video, it doesn't look so dark. Tell me how it's... Yeah. What is the record on the light? Well... Are you saying completely dark? Certainly the video shows a darkened space, for instance. That's one of the reasons it makes it unclear. Right. The video, you really can't... Pod B is really unavailable to us on the video. Largely I would agree. I would agree. But I think the evidence, the testimony of the officers, which I don't believe was rebutted, Mr. Thompson may disagree with me on that, but I don't believe was rebutted, was that the room was darkened. And they had to make this instantaneous entry. Well, counsel, there's a minute or two that you see only Pod B in the video, right? I'm looking at the right thing, right? There's a minute in there that you have a good shot of what happens in Pod B. Well, I think Pod B, as I recall, was on the right-hand side of the video. And I think you can only see it partially, and really once they open that door, all you see are the backs of the officers, was my recall. And darkness, in my recall, they were entering into a dark space. And there's no case that's ever said that officers can't throw in a disorienting device to give them some time to respond to whatever they're facing in this kind of unknown situation. The kicking in the face, again, would be just like stepping on an inmate. Of course... You're the one claiming Scott V. Harris, in this case, blatantly contradicted by the record. Have you pointed out in your brief the very part of that? Because my clerks thought they'd found the Pod B part of the video. Well, I think what I was primarily alluding to there was the video of the riot itself going on beforehand, kind of in conjunction with all of this, the barricading of the door, the fact that it took them a while to get this door even opened. Yeah, 35 to 40 minutes, the riot was over before they got in there, right? I would disagree with that. Well, that's what the district court says is the plaintiff's case that we have to take the facts on. Well, except that the video shows at least one masked detainee in the day room who runs from the officers back behind the shower curtain when they arrive. So you're looking at the right one. Yes, pushing water into the doorway. They look like they'd like to do something, but they're not doing anything. Do you think that's a fair assessment of that? Well, I think maybe from the comfort of this air-conditioned room, it looks that way. Yeah. But from the standpoint of an officer who's got to go in there and defend his bodily integrity, I think it would look a lot different. I think you've got inmates who are plotting to harm you. And the most dangerous ones are the ones that have locked themselves back in for 35 to 40 minutes with access to metal shelving and bunks and the like. We all know how ingenious inmates can be with fashioning weapons. Now, again, the video doesn't make them look very ingenious. They appear to be standing around in that pod B. The one does do the face and hide in the shower curtain. The rest just appear to be they like to get in trouble, but I think they're afraid to get in trouble. They're young too, right? Do you know the ages of the plaintiffs here? I don't. I think some of them were younger, and there were a couple that were a little bit older. I think the point you were about to make is that the—correct me if I'm wrong— what the video shows is the day room, and up on the right-hand side is pod B. Pod B is the bedroom component. We certainly do see the day room and the hour beforehand, which I would contend are riotous activities. And then we see these inmates barricade themselves in the cell, in a darkened cell, and these guards have to go in at risk of harm. And certainly they've got to be entitled to some opportunity to disorient the inmates upon their entry. There's certainly never been any case that says they can't do that. And then to act appropriately based on what they see. Wasn't there also some testimony that it was one of the inmates who offered to unjam the door? He did. I think it was inmate Manning said that he actually did, that he was able to pull the towel out. I think he even announced it to the officers ahead of time, you know, sort of relax, I'm going to open this for you, that sort of thing. He testified that he did. Now, I think the video refutes that. I think you see the guards struggling with the door. I may be looking at this wrong, and the court may look at it differently, but I think the video actually refutes that. But even if that's the case, it defies the we were accidentally locked in for sure. And it would certainly indicate to the guards that this was a planned barricade of the door. I see I'm well into my rebuttal time, so I'll reserve. Morning, Mr. Thompson. Good morning. May it please the court, my name is Morris Thompson, and I'm pleased to represent the appellees in this case. If I may, starting out, I may start off with a coffee. I'm not contagious, but would you believe at this age I've contracted asthma, and when I talk for a while I start coughing, and I left and didn't bring my inhalers, and that's why my voice sounds like this. While the appellate court's review of the denial of the defendant's claim of qualified immunity is de novo, it is limited to the question of law as to whether the legal norms allegedly violated by the appellants were clearly established at the time of the challenged actions. I'm referring, of course, to language in the 1995 Supreme Court case of Johnson v. Jones. Jones goes further to explain that a portion of a district court's judgment order that, although entered in a qualified immunity case, determined only a question of evidence sufficiency, that is, which facts a party may or may not be able to prove at trial, is not appealable. And this honorable court has stated the limitation thusly. We have jurisdiction over an order denying summary judgment based on qualified immunity when the issue on appeal turns on a legal determination of whether certain facts show a violation of clearly established law. That's Hammett v. Anderson, a correctional 2010 case that was decided, I believe, eight months or so before this incident. This honorable court went on and added clarity when it stated appellant review is limited to determining whether all of the conduct that the district court deemed sufficiently supported for purposes of summary judgment violated the plaintiff's clearly established federal rights. And that's in Shannon v. Kohler, a circuit case again in 2010. At no point in the appellant's brief do they make the argument that the appellees failed to put forth sufficient proof to state a violation of the appellee's constitutional rights or allege that said rights were not clearly established at the time of the complaint of the incident. Instead, the appellants framed the issues thusly. In their summary of the argument, they say, an issue in this matter is whether sufficient evidence exists to create a question of fact sufficient to deny appellants qualified immunity. Secondly, they go further and say, if the court were to find that a question of fact exists, each appellant is entitled to summary judgment. Thirdly, they assert, appellants assert first that the district court ignored or failed to consider the video evidence that contradicts appellee's statements that the riot was effectively over when the appellants entered the pod. And that this evidence alone proves that the force used was reasonable and necessary under the circumstances because of viable threats to the officers' safety and security of the facility still remain. And I could go on and point to other instances where they framed the issues and in fact framed their arguments in the same fashion. Essentially, but they do conclude with this. In this case, the legal question before the court is whether the use of force used by some of the appellants was excessive in a constitutional sense. The proof herein establishes that it was not. Obviously, they are making an evidence sufficiency argument. And this court has said, in previous cases, the law of this jurisdiction, even if a defendant frames an issue in terms of qualified immunity, we should determine whether he is simply arguing that the plaintiff offered insufficient evidence to create a material fact. Mr. Thompson, how about the question raised a minute ago about a lack of evidence of any specific jailer doing any specific act? All right. That's incorrect, Judge. We do point specifically to which jailers did what. I hate to use my memory on this because there are so many defendants involved and to state specifically what we allege. But the affidavits from the different appellants do state who shot whom with the beanbag gun, who kicked whom in the face, and on down the line, who threw the flashbang grenade into that small space. So, yes. That would be in the appellant's affidavit or in your client's affidavit? I'm sorry, the appellee's, my client's. Yes. And if you'll recall, we submitted affidavits from each of the appellees which said, I was laid prone on the ground, my hands out in front of me when the first is Edwards. He was laying in the- Can I interrupt for a second? Is there any dispute about whether the pod B was lit or dark? Yes, there is a dispute. We diametrically disagree with counsel's assertion that it was a darkened pod. There is no evidence of that anywhere. It's not in the appellant's self-serving statements. It certainly doesn't appear that way from the video, and there's absolutely no evidence. In fact, they didn't even argue that. We hear this for the first time today. From the video, it looks like it's got what I call medium light. Medium light. I would agree with that. And secondly, the video does show that pod B is the pod that is in the center of the frame. Off to the right, you can see a little bit of pod C, and you can see the jail is queuing up to go into pod C. Then you see them go to pod B. But early on, that's the second video. The first video, you see the door to pod B open, and you see one of the – well, none of these young guys are all broke-out and smart, as the expression goes. But one of the guys runs by, and you see him slam the door, because one of the things they're doing is they're trying to make noise to reverberate throughout that pod. And he slams my client's door. So we also disagree with opposing counsel's assertion that the guys in pod B, my clients, were involved. The video – all of my clients are African American. There is not an African American depicted in the first video or the second video. Now, one of them in pod B has the face covered most of the time, counsel. I don't know whether you can tell. The one off to the right, am I looking at the right video? I think not, Judge. Okay. Yeah, I think not. You don't see anybody in pod B out in the day room doing anything. They never come out of pod B, as many as they say when they're disturbed. And I agree with you, Judge. It's not much of a disturbance. These guys are flooding their toilets. They're slamming hatches on doors. One is tearing paper out of a book, getting it wet with the water and trying to cover the window. Things like that. They take a blanket and put it against the main entry door to keep the guards from spraying the caps and spray in. And that's about it. And in terms of the evidence, which opposing counsel suggests causes them to fear for their safety, they claim that the doors are barricaded. First and foremost, as we established, there's no way for the inmates, the detainees, to barricade the door. Even the main entry door into the cell swings out, not in. They can't barricade the door. Same is true for the pod door. As you see from the video, the jailers are pulling on the door, not pushing it in. They're pulling on the door. There's no way for them to barricade it. Yeah, but couldn't a towel or a blanket or something get jammed in there? Yes, as they say in their affidavit, to show to the jailers that we're not in it, my clients rolled up a blanket, put it in the doorway to prevent the water from running into their pod. They wanted it clean, pristine, so they could show we were not involved. But what happened is one of the young inmates who was involved, again, to make noise, as he was slamming and banging on different things, slammed their door shut. And that's what lodged it. Now, they also make an argument that if Mr. Manning could disengage the blanket from the door after the jailers was there, why hadn't he done it before? There's no indication that they knew that the door was wedged until the jailers tried to get it open. And at that point, as he attested in his affidavit, he stood up and he yelled through that hatch, if you guys don't shoot me, I'll pull the towel, I'll pull the blanket out. He then pulled the blanket out and jumped back on the floor, spread eagle. Does the video support that about yelling through the door and getting spread eagle? No, there's no sound to the video. No, but does it support actions like that in the video?  We can't see through the jail. And the jailers, the appellates, do not submit an affidavit to contradict that. It's totally uncontradicted. Now, while we're doing nits, you know, they say flatly Sheriff Byrd's not even there this day. Yes. But before you say anything, I noticed the district court says he is. He lists him in a laundry list but never refers to Byrd again. That's true. Now, what's the truth on Byrd? Okay. Later on, Sheriff Byrd submitted an affidavit. This was after the order. Submitted an affidavit saying I wasn't there. But up until that point, they never said that. Up until that point, they never said he was not there. So they didn't say that until the district court left the district court room.  Did the district court take any action after the affidavit was submitted? I believe the district court invited the jailers to address other issues such as the state law claims. And that's after this order that we're up on. And in that is when Sheriff Byrd submitted the affidavit saying I wasn't there. And the court then ruled on those state law claims. Now. So is there any counter evidence that Sheriff Byrd was there? No, sir. We don't have any. And that was part of the problem. So should Sheriff Byrd be given qualified immunity in our case? Or, in fact, probably dismissed. Yeah, probably dismissed. Now, in terms of his individual capacity, Now, I think that we still have time to, as I read the order, still have time to develop our case and establish liability for the municipality under Monell. But at this point, we've the problem is the motion for summary judgment was filed at such an early stage. We had not had an opportunity to do depositions. And I was relying primarily on my client's identification of who were the jailers there. And so what we do have, though, is the jail administrator. That's undisputed. He's in charge of the jail. He's next to the sheriff. He's got the authority. What's his name? Randall. Randall. Proceed. We've also got the chief deputy of the patrol. The order before us doesn't include the Monell issue, right? No. The trial judge ruled against us on that, ruled against us on that. Apparently didn't consider the fact of the personal involvement of people with that authority. Okay. So that will come up at the end of the case. That will come up again. Yes. Because, as I said, the jail administrator was there and active in giving direction, and the chief deputy over patrol was also there. Is that Falks or Falks? No, that is. I'm sorry, Judge. I'm not calling him a name. It's not critical. What is Falks or Falks? How do you say his name? I think it's Falks. Falks. How do you? What's Falks' position? A bully. No, I'm sorry. In terms of a. . . I understand. I understand. Okay. I think he is simply a patrol officer, a patrol deputy. Okay. Now, so where I was going, judges, is that I do not believe that this court has jurisdiction to even hear this appeal because primarily all the appellants are arguing sufficiency of the evidence. And, of course, this court knows that that is not an argument that renders this court jurisdiction to hear the appeal. We request. . . I'm running out of time. I've only got 30 seconds left, and there's so much more that was said that we totally contradict. One assertion that opposing counsel made is that they were afraid that there were violent or threatening detainees in the cell such that they had cause to throw the flashbang grenade, and that is not so. Our affidavit says, and the video shows, that the jail administrator is looking into the pod through the hatch. He could see them laying on the floor. Also, they also said in their statements that we did not know what was awaiting for us in the pod. So how then can you turn around and contradict yourself saying they had basis to believe that there were threatening people, and so therefore they were justified? And then finally, it defies reason for these officers to rush into that pod. As you see from the video how that cell is constructed, once they open the door, you've got about eight to nine officers armed with beanbag guns. One has a taser. All they have to do is open the door and tell the people in there, come out one by one, your hands on your head or behind your back, and submit to. There is absolutely no rational reason for them to run into the cell on top of these guys. And looking at the size of those cells, you've got six detainees laying on the ground on the floor. Then you've got eight to nine officers rushing in. It's impossible. Their stories in those statements are incredible. That in that confined space, I turn and shoot an inmate in the back who's aggressing on someone else. It defies logic and reason, and it's incredible. We ask the court to confirm the district court's finding that the appellants are not entitled to qualified immunity. Thank you. Thank you, Mr. Thompson. Mr. Owens, rebuttal? Yes, Your Honor. Let me begin with the failure to protect or intervene claim, which really hadn't been talked about. The district court actually conducted no analysis on that claim, simply saying that they alleged that Byrd and two others, Byrd who wasn't there, and two others failed to intervene to stop this alleged excessive force without conducting any analysis into the questions of whether they could have seen, it appears unlikely that they could have seen or had any ability to intervene, even if they concluded that excessive force was being used. There's no question that the other two were there, is there? That they were there, no. There's no question of that. But there's no evidence to suggest that they could even see into the cell, much less determine that excessive force was being used. And even if they could do that, there's no indication in the record that they had the deployment of a bean bag. That'd be like jumping in front of a bullet. There's just no ability to intervene there, even if the other parts of the analysis are conceded, which they're not. There's no evidence in the record for them either. With respect to the excessive force, we've just asked the court to focus in on the discreet claims of force. Randall and Lasker were the only two even accused of using these bean bag munitions. The other three, I believe, officers that entered into Pod B were accused only of stepping, either nothing, or of stepping on the detainees, kicking them, which I would submit is similar to or identical to stepping on them and or using this flashbang, which we kind of already talked about. I've exhausted my time, so if you have any questions. Thank you, Your Honor. Okay, hearing none, I appreciate your arguments today. The case will be submitted and will be decided in due course. As mentioned before, we'll stand.